# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH GALLOWAY, | : | Case No. 1:11-cv-850 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| CHESAPEAKE UNION EXEMPTED | : | |
| VILLAGE SCHOOLS BOARD OF | : | |
| EDUCATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER DENYING THE CHESAPEAKE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 57) AND GRANTING THE LAWRENCE COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 67)

This civil action is before the Court on Defendants Chesapeake Union Exempted Village School District Board of Education, Scott Howard, Sam Hall, Joseph Rase, and Jeannie Harmon's Motion for Summary Judgment (Doc. 57) ("the Chesapeake Defendants"), Defendants Lawrence County Joint Vocational School District Board of Education, Steve Dodgion, Kim Williams, and Susan Arthur's Motion for Summary Judgment (Doc. 67) ("the Lawrence County Defendants"), and the parties' responsive memoranda. (Docs. 74, 79, and 80).

## I. BACKGROUND

Plaintiff was at all relevant times a student at the Chesapeake Union Exempted Village Schools, which is operated by Defendant Chesapeake Union Village Schools Board of Education ("Chesapeake"). (Doc. 74 at 1-2). Plaintiff also attended classes provided by Defendant Lawrence County Joint Vocational School District Board of

Education ("JVS") and within Chesapeake High School. (*Id*. at 2). Plaintiff has been diagnosed with Asperger's Disorder, ADHD, seizure disorder, and specific learning disability, and alleges he has been the victim of disability- and sex-based discrimination, harassment, and bullying by both teachers and students in the Chesapeake school system since 2005. (*Id*.)

On October 23, 2012, the Court dismissed a number of Plaintiff's claims. (Doc. 34). Only four claims remain at issue in this case: Count II (equal protection against individual Defendants); Count III (Section 504/ADA against school district Defendants); Count IV (Title IX against school district Defendants); and Count VI (negligence against individual Defendants).

## II.     UNDISPUTED FACTS[1]

### A.     Chesapeake Defendants' Motion for Summary Judgment

1. Plaintiff attended Chesapeake Middle School for sixth grade and eighth grade for the school years 2005-2006 and 2007-2008.

2. Plaintiff attended Chesapeake High School for ninth, tenth and eleventh grades, which were school years 2008-2009, 2009-2010 and 2010-2011.

3. Plaintiff attended Marshall University for his twelfth grade year.

4. Plaintiff has been diagnosed with Asperger's Syndrome, ADHD and complex seizure disorder.

5. In the sixth grade at Chesapeake Middle School, one of Plaintiff's teachers was Defendant Harmon.

6. During the sixth grade, other students called Plaintiff "Seizure Boy" and threw water on their pants and acted as if they had a seizure once or twice.

---

[1] (*See* Docs 57-1, 67-1, and 76).

7. Plaintiff does not recall who did this to him.

8. In the eighth grade, after school, another student broke a 3-D scale model Plaintiff had created in a Project Lead the Way ("PLTW") class.

9. While Plaintiff was on the wrestling team in the eighth grade, another student pulled out his genitals and swung them toward Plaintiff on the wrestling team bus.

10. Plaintiff told his parents, who then informed school officials about this incident.

11. In the ninth grade, for a period of approximately four weeks, Plaintiff claimed another student rubbed his genitals on Plaintiff's back in the gym locker room during gym class.

12. This happened when the gym teacher was either not in the locker room or not looking.

13. Plaintiff alleged that different students would call him names during school.

## B.  Lawrence County Defendants' Motion for Summary Judgment

1. Defendant Lawrence County Joint Vocational School District Board of Education, ("JVS") serves seven public school districts, an educational service center, and a private school in Lawrence County, Ohio.

2. One of the public school districts served by Defendant JVS is Defendant Chesapeake.

3. Defendant JVS operates the Collins Career Center, a building on a campus separate from any of the member schools, and students from the member districts can enroll and attend classes there.

4. Defendant JVS also generally does business as the Collins Career Center.

5. Plaintiff never attended the Collins Career Center.

6. Member schools of Defendant JVS may choose to offer their students the opportunity to sign up for classes taught by JVS teachers for part of the day, through what is known as a satellite program.

7. Defendant Chesapeake hosts a satellite program of Defendant JVS' at Chesapeake.

8. The satellite program at Chesapeake utilizes a national pre-engineering curriculum known as PLTW.

9. Defendant JVS employs teachers who are trained in the PLTW curriculum to teach PLTW classes to Chesapeake middle and high school students at Chesapeake High School during the students' regular school day.

10. Both Defendant JVS and Defendant Chesapeake have anti-bullying policies.

11. Defendant Chesapeake's policies regarding student conduct, including Defendant Chesapeake's anti-bullying policy, apply to Chesapeake students even while in the PLTW class; the policies of Defendant JVS do not apply to student behavior in the PLTW class.

12. While PLTW teachers can supervise Chesapeake students within the PLTW classroom, they do not have the authority to impose discipline on the students in their classroom.  Instead, they fill out "white cards" to refer the students to Chesapeake administrators for a determination as to whether discipline is appropriate.

13. When the PLTW teachers are not teaching the Chesapeake PLTW courses, the participating students attend other classes at Chesapeake and the PLTW teachers go to other locations to teach PLTW in other school districts.

14. PLTW teachers do not supervise students at Chesapeake outside the PLTW class and are not present between classes or during lunch period.

15. Defendant Chesapeake retains the right to assign its students and can unilaterally remove them from PLTW without the approval of Defendant JVS.

16. Through the 2004-2005 school year, the first year that Plaintiff completed sixth grade, Plaintiff attended a private school unaffiliated with either Defendant Chesapeake or Defendant JVS, known as the Covenant School.

17. Although Plaintiff completed sixth grade at the private school, his parents enrolled him in Chesapeake Middle School to repeat sixth grade for the 2005-2006 school year.

4

18. Defendant JVS did not serve Plaintiff during his sixth grade year.

19. For Plaintiff's seventh grade year, he left Chesapeake and attended a different private school known as Grace Christian, which was unaffiliated with either Defendant Chesapeake or Defendant JVS.

20. At some point while attending Grace Christian, Plaintiff was first diagnosed with Asperger's Disorder.

21. Plaintiff returned to Chesapeake for eighth grade in the 2007-2008 school year, at which time he began participating in a PLTW class at Chesapeake High School.

22. Plaintiff participated in PLTW for the remainder of his time at Chesapeake through the end of the eleventh grade.

23. Plaintiff did not participate in PLTW during his senior year of high school, but instead attended Marshall University, where he is currently majoring in digital forensics.

24. Defendant Kim Williams was Plaintiff's PLTW instructor during his tenth grade year.

25. Defendant Williams instructed Plaintiff for one of his seven class periods per day, after which she would leave to teach PLTW classes in another school district.

26. Defendant Susan Arthur was Plaintiff's PLTW instructor during his eleventh grade year.

27. Defendant Arthur was properly licensed to teach during the year she taught Plaintiff.

28. Defendant Arthur taught PLTW at Chesapeake for two periods per day, after which she would leave to teach PLTW classes in another school district.

29. Defendant Steve Dodgion was the Superintendent of Defendant JVS at all times while Plaintiff was enrolled in PLTW.

30. Defendant Dodgion was (and is) properly licensed as a Superintendent.

31. Defendant Dodgion does not set policy for Defendant JVS, but instead implements policy set by its Board of Education.

32. Prior to January 2011, Defendant Dodgion knew nothing about Plaintiff or his involvement with the PLTW program.

33. Prior to the filing of this lawsuit, Defendant Dodgion had never heard of the incidents alleged in paragraphs 23(c) and 23(d) of the Corrected Amended Complaint, which allegedly occurred in the Chesapeake cafeteria.

34. The alleged destruction of one of Plaintiff's PLTW projects referenced in Complaint paragraph 23(a) occurred, according to Plaintiff's testimony, after school hours, outside the school building, during Plaintiff's eighth or ninth grade year.

35. After Plaintiff reported that another student had made an offensive comment about Plaintiff hanging himself, Defendant Chesapeake's Assistant Principal addressed the situation and it did not recur.

36. Defendant Dodgion did not know about the alleged offensive comment about Plaintiff hanging himself until this lawsuit was filed.

37. The alleged "petition" does not state a request that Plaintiff be removed from Defendant Williams's PLTW class.

38. The alleged "petition" consists of a piece of lined paper that was folded together with a second piece of computer paper. Defendant Williams' signature does not appear on the piece of lined paper.

39. The first page of the alleged "petition" on lined paper does not contain any signatures and states in its entirety:

> Joseph Galloway antagonizes our engineering class everyday! [*sic*] He constantly interrupts class everyday [*sic*] making it almost impossible to learn. He disregards every attempt that Mrs. Williams makes to get him to listen and cooperate. He makes threats to students all the time. Joseph also makes remarks on people's religious beliefs. He sits at the table and doesn't do any of the work he's supposed to, and he doesn't take notes. Then he yells at Mrs. Williams for not giving him the notes that he didn't take. Thank you for your time. POE Engineering Class

40. Plaintiff has no personal knowledge of how the paper came to exist.

6

41. The lined sheet of paper does not refer in any way to the signatures on the following unattached page, nor does the signature page make any reference to the statement on the lined page.

42. Plaintiff had never seen the "petition" prior to his deposition, and his only knowledge of the "petition" came from what his parents told him about the document.

43. Defendant Dodgion was not informed of the allegation that Defendant Williams had signed a "petition" against Plaintiff until the 2010-2011 school year, more than a year after the incident allegedly occurred.

44. Defendant Dodgion was informed of the allegation that Defendant Williams had signed a "petition" against Plaintiff by Defendant Chesapeake Principal Joseph Rase, not by Plaintiff or his parents.

45. At no time during Plaintiff's tenth grade year did Defendant Dodgion receive complaints from Plaintiff or his parents regarding Defendant Williams.

46. On November 10, 2010, Plaintiff yelled "it's hot as hell in here" in the middle of Defendant Arthur's class.

47. Profanity was a violation of Defendant Chesapeake's student handbook.

48. As a result of Plaintiff's yelling profanity in the middle of class, Defendant Arthur referred him to the office.

49. Defendant Arthur never referred Plaintiff to the office on any other occasion.

50. Defendant Chesapeake's records indicate that Plaintiff never served even a detention for the incident.

51. Plaintiff's parents did not attempt to contact Defendant Dodgion about Plaintiff until late January 2011, and their only meeting with any JVS official prior to Plaintiff's final day in PLTW occurred on February 14, 2011, just a few months before Plaintiff left Chesapeake.

52. Defendant Dodgion had no knowledge of any allegations of peer-on-peer discrimination or harassment.

53. In approximately February 2011, after earning Ds in PLTW at the end of the second quarter, Plaintiff was removed from Defendant Arthur's class for one period a day at the request of his parents, and instead was tutored by another PLTW teacher, Mr. Oehler, during one of the two periods he was scheduled to attend Defendant Arthur's classes.

54. Subsequent to the February 14, 2011 meeting, Defendant Dodgion instructed Defendant Arthur to send daily e-mails to Plaintiff's parents with a copy to Defendant Dodgion regarding whatever happened in that day's PLTW class, and she did so.

55. Defendant JVS provided Plaintiff with a laptop in February 2011 to assist with his schoolwork and permitted him to take it home with him.

56. On February 21, 2011, a student called a friend a "faggot" in PLTW class, and Defendant Arthur required the student to apologize and told him that she did not want to hear language like that in her classroom.

57. In 2011, Plaintiff was reassigned to Chesapeake teacher Mr. Michael's classroom, but Plaintiff was resistant to the removal and appeared in Defendant Arthur's classroom for instruction, even though his parents had requested his reassignment elsewhere.

58. Plaintiff's parents later requested that Plaintiff be put back into Defendant Arthur's classroom for the remainder of the year so that he could enjoy free time with his PLTW classmates.

## III. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be

construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but … must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

### A.    Chesapeake Defendants' Motion for Summary Judgment

#### 1.    Equal Protection

"To state a claim under the Equal Protection Clause, a Section 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class*." LRL Properties v. Portage Metro. Hous. Auth*., 55 F.3d 1097, 1111 (6th Cir. 1995).  "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ*., 470 F.3d 250, 260 (6th Cir. 2006).  Because people with disabilities "are not [considered] a [protected or] suspect class for purposes of an equal protection challenge[,] … [a] state may … treat disabled students differently, so long as its actions are rationally related to some legitimate governmental purpose." *S.S. v. E. Ky. Univ*., 532 F.3d 445, 457 (6th Cir. 2008).

##### a.    Supervisors

As to the Chesapeake supervisors, Defendants Hall, Rase, and Howard, Section "1983 liability must be based on more than the right to control employees.  Section 1983

liability will not be imposed solely upon the basis of *respondeat superior*. There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). At a minimum, Plaintiff "must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id.* at 421. The question at the summary judgment stage is whether Plaintiff has presented actual evidence of knowing acquiescence by the supervisory Defendants to create a genuine issue of material fact such that the question should be presented to a jury.

### i.    Sam Hall

Defendant Hall was Superintendent of Defendant Chesapeake during Plaintiff's sixth grade year, when he alleges issues with children teasing him about his seizures and issues with his teacher, Defendant Harmon, discussing the matter in front of the whole class and belittling him. Plaintiff has provided evidence that Mr. and/or Mrs. Galloway contacted Defendant Hall several times, including once just after a school board meeting, complaining about Defendant Harmon's cavalier attitude about Plaintiff's disabilities. (Doc. 61 at 10). Mrs. Galloway also sent an e-mail that was copied to Defendant Hall on May 19, 2006, in which she specifically said Plaintiff was called "seizure boy" and was "bullied relentlessly." (Doc. 74-7). There is no evidence that Hall took any action on the Galloways' verbal or written complaints and, contrary to district policy, there is no evidence that he even conducted any investigations.

Defendant Hall's testimony is that he did not hear anything about Plaintiff being teased or harassed about his seizures, and that his meetings with Plaintiff's mother concerned IEP issues with Plaintiff.  Given the Galloways' testimony that Defendant Hall was made aware of Plaintiff's bullying repeatedly, there is obviously a genuine dispute of material fact as to whether he knowingly acquiesced in Defendant Harmon's alleged violation of Plaintiff's right to equal protection.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's Equal Protection claim against Defendant Hall.

### ii.     Joseph Rase

Defendant Rase was principal of Chesapeake High School while Plaintiff was a student there.  Plaintiff has provided evidence that Defendant Rase knew about the allegation that students had broken Plaintiff's computer, the allegations that students had rubbed their penises against Plaintiff's back in the locker room, and the "petition."  (Doc. 66 at 10-15, 23-24).  Plaintiff has provided evidence that Defendant Rase spoke with Plaintiff's parents about their concerns about bullying and the staff's lack of knowledge about Plaintiff's disabilities, and attended meetings with the Galloways on the same subjects.  (*Id.* at 31).  According to Defendant Howard, Defendant Rase would regularly give Defendant Howard a "heads-up" about incidents involving Plaintiff, including at least the sexual assault allegations, the allegation that Plaintiff's PLTW project was smashed against a wall, the allegation that Plaintiff's laptop was broken, the allegation that Plaintiff was being "pantsed" and that boys were whipping out their genitals at Plaintiff, the allegations that students would pull Plaintiff's chair out from under him, and

11

the allegations that Plaintiff was punched in the back on several occasions. (Doc. 63 at 11-15).

Yet despite his testimony that, by practice, he would have investigated the specific incidents alleged, he testified that he knew of no written reports ever done on any of the allegations, and Plaintiff alleges that he misinterpreted the district's policy on reports of bullying by stating that he only had to produce a written report when allegations were substantiated. (Doc. 74 at 56-57). Because there was never anything written down regarding any of Plaintiff's allegations, Defendant Rase could not state whom he (or other administrators) interviewed, or why he could not substantiate Plaintiff's allegations. Defendant Rase did not call the Sheriff or Children's Services about the sexual assault allegations, even though he said he had done so for allegations of male-to-female sexual assault, drug use, weapons, fighting, and other alleged violations of the law. (Doc. 66 at 14-15).

Moreover, Plaintiff's fellow student Brandon Call testified that he had kicked Plaintiff in the genitals with no consequence, even though he was taken to the office by the gym teacher. (Doc. 74-1 at 5). He and student Rachel Frye testified that it was common knowledge around the school that Plaintiff was the target of bullies. (Doc. 74-1 at 8; Doc. 74-4 at 9-10). Frye even testified that she was bullied by having her car tires slashed several times, and that she went to Defendant Rase, but nothing was done. (Doc. 74-4 at 22-23). Yet Plaintiff has provided evidence that despite Defendant Rase's knowledge of repeated allegations of bullying, and despite his knowledge that students in PLTW, in his own estimation, were petitioning him to remove Plaintiff from the class,

12

not a single piece of paper has been produced acknowledging that any investigation was ever done.  Given that Plaintiff is entitled to have the facts viewed in the light most favorable to him, and is entitled to all reasonable inferences, there is at least a genuine issue of material fact as to whether Defendant Rase knowingly acquiesced in violations of Plaintiff's equal protection rights.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's Equal Protection claim against Defendant Rase.

### iii.    Scott Howard

Defendant Howard was the superintendent of Defendant Chesapeake while Plaintiff was in high school.  Defendants claim that Howard did not have enough information to connect Plaintiff's complaints of bullying and harassment to each other. (Doc. 57 at 13).  However, Defendant Howard was fully aware of most of the major incidents alleged in this lawsuit; he testified that Defendant Rase would regularly give him a "heads-up" about incidents involving Plaintiff, including at least the sexual assault allegations, the allegation that Plaintiff's PLTW project was smashed against a wall, the allegation that Plaintiff's laptop was broken, the allegation that Plaintiff was being "pantsed" and that boys were whipping out their genitals at Plaintiff, the allegations that students would pull Plaintiff's chair out from under him, and the allegations that Plaintiff was punched in the back on several occasions.  (Doc. 63 at 11-15).  Defendant Howard was being told of repeated acts of allegedly and/or potentially criminal activity by students, yet he repeatedly left it to the building principal to handle, never once "connecting the dots" to conclude that whatever the principal was doing was not working.

Further, if there was not sufficient information to "connect the dots," as Defendant Howard claims, Plaintiff has provided evidence suggesting that this is because Defendant Howard (the superintendent!), and every district representative, violated the district's policies by failing to keep proper disciplinary records, or any records at all. No one at the district level or from the high school could look back at any records from when Plaintiff was in junior high to see if he had been the victim of bullying then, because no one kept records about the bullying allegations or the allegations of disability discrimination that surfaced in junior high. Defendant Howard acknowledged that the Chesapeake bullying and hazing policy requires a written report of investigation on every allegation of bullying and hazing, not just those that have been found to have merit. (Doc. 63 at 24). He also acknowledged that if there was no written report done on any of the allegations regarding Plaintiff, this would constitute a violation of the district's policy. (*Id.*) Therefore, every time Defendant Rase gave Defendant Howard a "heads up" about another incident, Defendant Howard was under an obligation to make sure the allegation was properly investigated and documented. Instead of seeing the alleged pattern of bullying and abuse, Plaintiff has provided evidence suggesting that Defendant Howard treated each incident separately and did not take any of these incidents seriously (including repeated allegations of sexual assault). There is at least a genuine dispute of material fact as to whether Defendant Howard knowingly acquiesced in violations of Plaintiff's rights.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's Equal Protection claim against Defendant Howard.

14

### b.    Jeannie Harmon

Plaintiff alleges:

    a.  In sixth grade, his teacher Mrs. Jeannie Harmon asked [Joseph], in front of the entire class, if he really had seizures and questioned what the seizures looked like because "I have never seen you have a seizure."  Joseph was so embarrassed he came home crying that day;

    b.  In sixth grade, during a parent-teacher conference, Mrs. Harmon told Mr. and Mrs. Galloway that it was a "nuisance to teach Joseph," that he was "lazy," not disabled, and that his parents were "enabling" him to feel like a victim;

    c.  Throughout his sixth grade year, Mrs. Harmon continued to quiz Joseph in front the entire class about the validity of his seizure disorder;

    d.  During a seizure, Joseph often became incontinent, and other children in his class mimicked him by throwing water on their pants and shaking themselves violently, and calling Joseph "seizure boy," all with the knowledge and approval of Mrs. Harmon.

(Doc. 19 at ¶ 19).  In its ruling on the motions to dismiss, this Court found Plaintiff had sufficiently alleged disparate treatment based on disability on the part of Defendant Harmon, and Plaintiff has now presented evidence to support these allegations.  (*See* Doc. 61 at 6-7, 9-11; Doc. 64 at 11; Doc. 65 at 7, 12-13).  In summary, Plaintiff has provided evidence that Defendant Harmon questioned Plaintiff in front of the class about his seizures and whether he even had them, allowed students to tease Plaintiff on an almost daily basis, some of it concerning his seizures, made her own arbitrary determinations as to how much time was enough for Plaintiff to complete assignments given his disability, and displayed a cavalier attitude about Plaintiff's disabilities by stating that he was lazy, questioning whether he was really disabled, suggesting that his parents were enabling

him, and stating that he was a nuisance to teach.  (*Id.*)  Plaintiff has therefore provided

evidence tending to suggest that Defendant Harmon was aware of and deliberately

indifferent to Plaintiff's plight, and that Defendant Harmon denies any awareness of the

alleged harassment confirms the existence of a genuine dispute of material fact as to this

question.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's

Equal Protection claim against Defendant Harmon.

### 2.    Rehabilitation Act and ADA

Count III alleges that Defendant Chesapeake violated Plaintiff's rights under

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101-12213.  To establish a claim that he was

discriminated against on the basis of his disability under the Rehabilitation Act or the

ADA, Plaintiff must show that (1) he is handicapped or disabled as defined in each

statute, (2) he is "otherwise qualified" to continue in the program, and (3) he was

discriminated against on the basis of his handicap or disability.  *Kaltenberger v. Ohio*

*College of Podiatric Medicine*, 162 F.3d 432, 435 (6th Cir. 1998) (*citing Andrews v. State*

*of Ohio*, 104 F.3d 803, 807 (6th Cir. 1997)).  A handicapped or disabled person is

"otherwise qualified" to participate in a program if he can meet its necessary

requirements with reasonable accommodation.  *Sandison v. Michigan High Sch. Athletic*

*Ass'n., Inc.*, 64 F.3d 1026, 1034 (6th Cir. 1995).  Discrimination includes:

> A failure to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. Section 12182(b)(2)(A)(ii).

The Sixth Circuit has applied the test enunciated in *Davis v. Monroe County Board of Ed.*, 526 U.S. 629 (1999), regarding Title IX student-on-student sexual harassment to Section 504/ADA claims of student-on-student disability-based harassment.  *S.S.*, 532 F.at 454.  The Sixth Circuit adopted a five-part test to determine if a plaintiff could sustain a disability-based peer-on-peer claim.  The plaintiff must show: 1) the plaintiff is an individual with a disability; 2) he or she was harassed based on that disability; 3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment, 4) the defendant knew about the harassment, and 5) the defendant was deliberately indifferent to the harassment.  (*Id.*)[2]

---

[2] Several courts have recognized hostile educational environment claims under Section 504 and the ADA.  *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 313-314 (D. Mass, 1997); *see also Gaither v. Barron*, 924 F.Supp. 134, 136 (M.D. Ala. 1996) (using Title VII's hostile work environment theory to analyze a harassment claim brought by a disabled student); *Pell v. Trustees of Columbia Univ. In City of New York*, No. 97 CIV. 0193 (SS), 1998 WL 19989, at *17-18 (S.D.N.Y. Jan. 21, 1998) (concurring with the reasoning in *Guckenberger*); *K.M. v. Hyde Park Central School Dist.*, 381 F. Supp. 2d 343, 360 (S.D.N.Y. 2005) (a school district's deliberate indifference to pervasive, severe disability-based harassment that effectively deprived a disabled student of access to the school's resources and opportunities would be actionable under Section 504 and Title II).

While claims under the Rehabilitation Act and the ADA are largely the same, the defendant must also receive federal funds to establish a claim under the Rehabilitation Act. *McPherson v. Michigan High Sch. Athletic Ass'n., Inc*., 119 F.3d 453, 459-60 (6th Cir. 1997).  A plaintiff's Section 504 and ADA claims may be analyzed together because the statutes provide the same remedies, procedures and rights.  *S.S.*, 532 F.3d at 452-53.  Defendants do not deny that Defendant Chesapeake receives federal funds.

As this Court has ruled, Plaintiff pled sufficient facts to establish claims under Section 504 and the ADA.  (Doc. 34 at 16-18).  Plaintiff has now presented evidence to support those allegations of disability-based discrimination against Defendant Chesapeake.  Here,  Defendant Chesapeake knew Plaintiff had disabilities, that he was being bullied, and that much of the bullying was directly related to or proximately caused by his disabilities.  Both Brandon Call and Rachel Frye testified that it was common knowledge that Plaintiff had disabilities, both seizures and Asperger's; students knew those disabilities made him different and they knew he would not fight back if attacked verbally or physically.  The faculty and administration were told about numerous and repeated bullying incidents over the course of several years.  Yet because of the previously discussed failure to adhere to their own rules for reporting allegations of bullying, investigating those allegations, and producing written reports, each bullying incident was viewed in isolation, rather than addressed as part of an alleged pattern.  In this case, accepting all factual assertions as true and construing the facts in the light most favorable to Plaintiff, Plaintiff was continually harassed, partially due to his disability. He was the victim of sexual assaults.  His own teachers participated in the discrimination.

18

When his parents complained, nothing sufficient was done to stop the harassment and discrimination.  There is at least a genuine issue of material fact as to whether Defendant Chesapeake violated Plaintiff's rights under Section 504 of the Rehabilitation Act and the ADA.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's Section 504 and ADA claims against Defendant Chesapeake.

**3.    Title IX**

Count IV alleges that Defendant Chesapeake violated Plaintiff's rights under Title IX, 20 U.S.C. § 1681.  Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance…"  20 U.S.C. § 1681.  Title IX can support a cause of action for a claim of student-on-student sexual harassment against a recipient of federal funds.  *Davis*, 526 U.S. at 633.

To establish a *prima facie* case of student-on-student sexual harassment, the plaintiff must demonstrate each of the following elements:

> 1) the sexual harassment was so severe, pervasive and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school,
>
> 2) the funding recipient had actual knowledge of the sexual harassment, and
>
> 3) the funding recipient was deliberately indifferent to the harassment.

*Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 258-259 (6th Cir. 2000).

The deliberate indifference "must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 260 (*quoting Davis*, 526 U.S. at 645). "[A] plaintiff may demonstrate [a] defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassments or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 260 (*quoting Davis*, 526 U.S. at 648). "[W]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Id.* at 261.

Relying on this language, the Sixth Circuit determined that where a student suffered four years of harassment from various other students, a school district's "tactic of merely talking to and warning students who harassed plaintiff," with occasional investigation into "some of the more significant incidents and even eventually proactively speaking to students and teachers in an effort to prevent further incidents … raised a genuine issue of material fact sufficient to withstand summary judgment." *Patterson v. Hudson Area Schools*, 551 F.3d 438, 446 (6th Cir. 2009) (*quoting Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 966 (D. Kan. 2005). In *Patterson*, like in the present case, a young man alleged constant abuse, bullying, and harassment, culminating in an incident in a locker room in which another young man stripped naked, jumped on the plaintiff's shoulders "and rubbed his penis and scrotum on [the plaintiff]'s

neck and face." *Id.* at 442.  The  court  correctly called this a "sexual assault."  *Id.*
Despite the fact that the school district took some actions against specific students, the
harassment continued.

The Sixth Circuit overturned the district court's grant of summary judgment to the
school district, citing its earlier ruling in *Vance* that "once [a school district] had
knowledge that its response was inadequate, it was required to take further reasonable
action in light of the circumstances to avoid new liability."  *Id.* at 447 (*quoting* 231 F.3d
at 262).

> We believe this language makes clear that, even though a school district
> takes some action in response to known harassment, if further harassment
> continues, a jury is not precluded by law from finding that the school
> district's response is clearly unreasonable.  We cannot say that, as a matter
> of law, a school district is shielded from liability if that school district
> knows that its methods of response to harassment, though effective against
> an individual harasser, are ineffective against persistent harassment against
> a single student.  Such a situation raises a genuine issue of material fact for
> a jury to decide.

*Patterson*, 551 F.3d at 447.

Plaintiff sufficiently pled a cause of action under Title IX.  (Doc. 34 at 20-21).
Plaintiff has now presented evidence to support that claim against Defendant Chesapeake.
There is direct evidence that Plaintiff was repeatedly sexually assaulted, like the student
in *Patterson*.  Defendants have provided no evidence that the school district took any
action, even when told of the repeated harassment.  Brandon Call testified that he kicked
Plaintiff in the groin, was briefly questioned about it, and then given no discipline.  (Doc.
74-1 at 7).  Call testified that he witnessed at least one incident of sexual assault against
Plaintiff, and was aware of many others.  (*Id.* at 7-8).  Defendant has provided no

21

evidence that anything was done, even though Defendant Rase testified that at one point in the school year he was told about the incidents by Mr. Galloway.  (Doc. 66 at 11-12). According to Call, a group of five or six bullies would frequently target Plaintiff for sexually-oriented bullying, including pulling out their penises near him and trying to get him to look, pulling down Plaintiff's pants, and regularly grinding their penises against Plaintiff's back, all the while calling him "gay," "queer" and indicating that he "liked it." 74-1 at 7-9).  There is ample evidence creating at least a genuine dispute of material fact as to whether the school district was deliberately indifferent to the alleged sex-based harassment against Plaintiff.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's Title IX claim against Defendant Chesapeake.

### 4.     Negligence

To establish negligence, Plaintiff must prove:  1) Defendants owed him a duty; 2) that duty was breached; and 3) that breach of duty proximately caused Plaintiff's injury.  *Moncol v. Bd. of Ed. of N. Royalton School Dist.*, 55 Ohio St.2d 72, 378 N.E.2d 155, 158 (1978).  As to the first element, a teacher in a public school has been held to an ordinary duty of reasonable care in exercising his or her duties.  *Baird v. Hosmer*, 46 Ohio St.2d 273, 347 N.E.2d 533, 534 (1976).  This is the same duty owed by the general public to other people.

Nevertheless, under O.R.C. Chapter 2744, an employee of a political subdivision is immune from liability unless one of the following applies:

22

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibility;

(b) The employee's acts or omissions were with malicious purpose or in bad faith or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

O.R.C. § 2744.03(A)(6).  The Supreme Court of Ohio clarified the definitions of "wanton" and "reckless" in *Anderson v. Massillon*, 134 Ohio St.3d 380, 383, 2012-Ohio-5711, 983 N.E.2d 266.  The Court observed that the legislature expressly removed immunity from employees of political subdivisions for wanton or reckless conduct in O.R.C. §2744.03(A)(6)(b), thus implying that employees are immune from negligent acts or omissions.  *Id*. at ¶ 23.  The Court then defined both "wanton misconduct" and "reckless conduct" as they should be interpreted under the statute.  Wanton misconduct is the failure to exercise any care towards those to whom the duty of care is owed in circumstances in which there is great probability that harm will result.  *Id.* at ¶ 33. Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct.  *Id.* at ¶ 34.  The Court also noted that it has observed that "willful" and "wanton" describe different and distinctive degrees of care and are not interchangeable.  *Id.* at ¶ 31.

Plaintiff asserts that the individual Defendants are not immune because they acted "with malicious purpose, in bad faith or in a wanton or reckless manner."  As this Court has previously found, the question of whether behavior constitutes reckless or wanton

conduct so as to fall within the exception to statutory immunity is ordinarily a factual question for a jury to decide. *Alexander v. Lawrence Cty. Bd. of Developmental Disabilities*, No. 1:10-CV-697, 2012 WL 831769, at *12 (Mar. 12, 2012) (*citing Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 355, 639 N.E.2d 31, 35 (1994)).

In its ruling on the motions to dismiss, this Court found that Plaintiff had sufficiently pled facts which would support a claim of negligence/gross negligence against the individual defendants. (Doc. 34 at 23-25). Plaintiff has now presented evidence to support those claims: the same evidence that supports Plaintiff's Equal Protection claims against these Defendants, discussed and cited above. The evidence Plaintiff has presented as to the acts and omissions of all of the individual Chesapeake Defendants creates at least a genuine dispute of material fact as to whether those acts and omissions constitute negligence/gross negligence and are outside the scope of state law immunity.

The Court finds that summary judgment is therefore inappropriate as to Plaintiff's negligence claims against Defendants Hall, Rase, Howard, and Harmon.

**B.**     **Lawrence County Defendants' Motion for Summary Judgment**

**1.**     **Equal Protection**

As set forth above, "to state a claim under the Equal Protection Clause, a Section 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *LRL Properties*, 55 F.3d at 1111. "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough*, 470 F.3d at 260.

**a.**     **Steve Dodgion**

As to the JVS supervisor, Defendant Dodgion, Section "1983 liability must be based on more than the right to control employees.  Section 1983 liability will not be imposed solely upon the basis of *respondeat superior*.  There must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Bellamy*, 729 F.2d at 421.  At a minimum, Plaintiff "must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Id*.  The question at the summary judgment stage is whether plaintiff has presented actual evidence of knowing acquiescence by Defendant Dodgion to create a genuine issue of material fact such that the question should be presented to a jury.

There is no evidence of unconstitutional conduct by any of Defendant Dodgion's subordinates, as set forth more fully below, but even if there were, there is also no evidence that Defendant Dodgion had any notice of any such conduct or responded

inappropriately to any information he did receive. There is no evidence that the allegations forming the basis for Plaintiff's Equal Protection claims were discussed on February 14, 2011, during the first and only meeting the Galloways had with Defendant Dodgion prior to the end of Plaintiff's final school year, and the evidence shows that Defendant Dodgion had no notice of the "petition" incident until a year after Defendant Williams taught Plaintiff. (Doc. 68 at 62-64, 82). After the meeting, Defendant Dodgion instructed Defendant Arthur to send daily e-mails to the Galloways regarding whatever happened in class that day, with copies to him, and she did so. (Doc. 68 at 57; Doc. 70 at 191). The Galloways did not raise any claim regarding alleged disproportionate discipline until February 21, 2011, a week after their meeting with Defendant Dodgion. (*Id.* at 131). The only further communication to Defendant Dodgion indicating parental discontent with any Lawrence County Defendant evidenced is a May 16, 2011 e-mail from Plaintiff's parents in which they demanded Plaintiff be removed from Defendant Arthur's supervision. (Doc. 67-2 at 19). This request was granted, although Plaintiff was resistant to the reassignment. (*Id.* at 27, 40-41).

The Court therefore finds that Plaintiff has failed to provide evidence that Defendant Dodgion implicitly authorized, approved or knowingly acquiesced in any unconstitutional conduct, and thus summary judgment is appropriate as to Plaintiff's Equal Protection claim against Defendant Dodgion.

### b. Kim Williams

There is no evidence that Defendant Williams treated Plaintiff differently than similarly situated non-disabled individuals on the basis of his disability. Plaintiff alleges

that a student made an offensive comment to him about hanging himself, allegedly in Defendant Williams' classroom.  However, Plaintiff has provided no evidence that Defendant Williams intentionally handled this alleged incident in a disparate manner on the basis of Plaintiff's disability.  Both Defendant Williams and Plaintiff agree that the students involved met with the Assistant Principal, who addressed the situation.  (Doc. 58 at 12, 25; Doc. 69 at 130-31, 134, 146).  There is no evidence that the incident recurred after it was addressed.  Plaintiff also alleges that Defendant Williams treated Plaintiff in a disparate manner by knowingly signing a "petition," also signed by several students in the PLTW class, saying that they wanted Plaintiff "out of there."  (Doc. 19 at 29).  However, Defendant Williams's undisputed testimony is that she signed a blank piece of paper at a student's request as she ran out the door to teach at another school.  (Doc. 69 at 94-98, 102-04, 107-12).  Defendant Williams testified that it was not until Defendant Rase spoke with her that she was aware that the paper had anything to do with Plaintiff.  (*Id.* at 119).  No witness has refuted Defendant Williams's testimony, and Plaintiff admitted he has no personal knowledge of how the document came to exist.  (Doc. 58 at 89).  In fact, Plaintiff testified that he generally did not pay any attention to how other students were treated, and that he was mostly focused on himself.  (*Id.* at 38).

The Court therefore finds that Plaintiff has failed to provide evidence that Defendant Williams engaged in any unconstitutional conduct, and thus summary judgment is appropriate as to Plaintiff's Equal Protection claim against her.

### c. Susan Arthur

There is also no evidence that Defendant Arthur treated Plaintiff differently than similarly situated non-disabled individuals on the basis of his disability.  Plaintiff's only allegation against Defendant Arthur with regard to disparate treatment is that she disciplined him in a disproportionate way compared to students without disabilities. However, Defendant Arthur did not have the authority to impose discipline on the students in her classroom.  (Doc. 66 at 9; Doc. 68 at 79-80; Doc. 69 at 125; Doc. 70 at 94-95, 136).  Further, there is no evidence that Defendant Arthur referred Plaintiff to the office other than one time for yelling profanity in the middle of class.  (Doc. 58 at 19; Doc. 70 at 134).  Profanity was a violation of the student handbook, and Plaintiff admits that he said "it's hot as hell in here."  (*Id.*)  Moreover, a single office referral does not rise to the level of a constitutional violation.

There is no evidence that Defendant Arthur had knowledge prior to the February 14, 2011 meeting that Plaintiff had problems with any other student in the PLTW class. After the February 14th meeting, when the Galloways mentioned an issue in another class with one student, the evidence shows that Defendant Arthur permitted Plaintiff to choose his group or to work independently while doing work in class.  (Doc. 67-2 at 5, 20-23, 25, 47; Doc. 68 at 132-34; Doc. 70 at 94-100).  Moreover, the undisputed evidence shows that at least regarding one incident in which Defendant Arthur felt that Plaintiff may have been targeted by another student who flicked cornstarch at him, she sent the other student to the office and he ultimately was sent to an alternative school.  (Doc. 67-2 at 37; Doc. 70 at 128).  Plaintiff recalled the incident, but not what Defendant Arthur did in response.

(Doc. 58 at 90-91).  Plaintiff's remaining allegations against Defendant Arthur seem to be based on Plaintiff's unfavorable opinion of how she taught him, but he has introduced no evidence regarding how Defendant Arthur may have taught others differently and has indicated that he was generally unaware of how anyone else was treated.  (*Id.* at 38).  Such allegations do not establish an Equal Protection claim for trial.

The Court therefore finds that Plaintiff has failed to provide evidence that Defendant Arthur engaged in any unconstitutional conduct, and thus summary judgment is appropriate as to Plaintiff's Equal Protection claim against her.

### 2.        Rehabilitation Act and ADA

Plaintiff's Section 504/ADA claims against Defendant JVS fail because Plaintiff cannot show the requisite control or knowledge to establish liability against the entity.  Furthermore, although Defendant JVS had no notice of bullying by students or teachers, it responded appropriately to the types of concerns that were communicated to it.  As previously discussed, to establish a claim under Section 504 or the ADA, Plaintiff must first show that he was subjected to intentional discrimination by reason of his disability.  *Tucker v. Tennessee*, 539 F.3d 526, 535 (6th Cir. 2008).  This intentional discrimination can be proven by direct evidence (which does not exist in this case), or can be inferred from deliberate indifference, which requires both "knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood."  *Hill v. Bradley County Bd. of Educ.*, No. 1:05-cv-279, 2007 U.S. Dist. LEXIS 85394, at *58 (E.D. Tenn. Nov. 19, 2007), *aff'd*, 295 Fed. Appx. 740 (6th Cir. 2008) (citations omitted).  Where the response to reported harassment is not clearly unreasonable, deliberate

indifference is not shown; the deliberate indifference standard does not require schools to create an environment free of all peer harassment or to meet particular remedial demands of the victim.  *Waters v. Perkins Local Sch. Dist. Bd. of Educ.*, No. 3:12-cv-00732, 2014 U.S. Dist. LEXIS 44415, at *13-14 (N.D. Ohio, March 31, 2014).

The issue of control does not appear to have arisen in Section 504/ADA cases (as the school defendant is typically the school district where the student is enrolled), but the *Davis* requirement that the entity be shown to "exercise substantial control over both the harasser and the context in which the known harassment occurs" logically applies under Section 504 and the ADA, as well.  526 U.S. at 645 (construing similar language under Title IX).

Plaintiff cannot make such a showing in this case.  With regard to Plaintiff's allegations that relate to conduct in his PLTW classes, the evidence shows that these alleged incidents did not occur in locations or during activities under the control of Defendant JVS or were adequately addressed:

- As to the destruction of one of Plaintiff's PLTW projects, Plaintiff testified that the incident occurred after school hours and outside the school building.  (Doc. 58 at 29-30).

- As to Plaintiff's allegation that his back was injured after someone pulled a chair out from under him in PLTW, Plaintiff testified that the chair-pulling incident that supposedly caused a back injury did not actually occur in the PLTW classroom. (*Id.* at 22, 80).

- As to Plaintiff's allegations of "daily bullying" in PLTW, the only description of such bullying references the school cafeteria, which is outside of Defendant JVS's control. (Doc. 19 at ¶ 23).

- As to Plaintiff's allegations of students stealing his backpack and smashing his computer screen, Mrs. Galloway testified this incident occurred in the cafeteria rather than the PLTW classroom.  (Doc. 61 at 22).

- As to Plaintiff's allegation of a single offensive comment made by a student during a PLTW class in tenth grade, Plaintiff testified that this incident was addressed by Chesapeake's Assistant Principal.  (Doc. 58 at 12, 35).

Regardless, whether these incidents occurred as alleged is irrelevant to the outcome here, because Plaintiff has also failed to provide evidence that Defendant JVS had any actual knowledge of them.  Even if Plaintiff could show that he was subjected to severe and pervasive harassment based on his disability, there is no evidence to show that Defendant JVS had knowledge of any peer-on-peer harassment such that it could be held liable under Section 504 or the ADA.  Evidence relating to harassment that was not reported is not material and cannot preclude summary judgment.  *Waters*, 2014 U.S. Dist. LEXIS 44415 at *5 (citations omitted).  Knowledge in this context means actual knowledge by a school official that the harassment was occurring.  *See Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274 (1998) (principles of *respondeat superior* or constructive notice do not apply); *S.S.*, 532 F.3d at 453-454 (applying the *Davis* standard

31

from Title IX cases to 504/ADA case).  Throughout the extensive discovery period, Plaintiff presented no evidence to show that any JVS official was aware of the alleged discrimination or harassment by Chesapeake students in the PLTW class.  Plaintiff has provided no evidence that at any point prior to February 14, 2011 (*i.e.* during the prior three-and-two-thirds school years that Plaintiff participated in PLTW), Defendant JVS was ever notified of any allegations of peer-on-peer discrimination or harassment.

Furthermore, as established in Sections (B)(1)(b) and (c), *supra*, there is also no evidence that Defendants Williams or Arthur engaged in any intentional discrimination on the basis of disability, that Defendant JVS knew of any such discrimination, or that Defendant JVS responded inadequately to any concerns that were brought to its attention.

The Court finds that summary judgment is therefore appropriate as to Plaintiff's Section 504 and ADA claims against Defendant JVS.

### 3.    Title IX

As to Defendant JVS, Plaintiff agrees that the Title IX claim against Defendant JVS should be dismissed.  (Doc. 74 at 75).

### 4.    Negligence

Plaintiff's negligence claim against the individual Lawrence County Defendants appears to be based on  the alleged bullying of  Plaintiff and the Lawrence County Defendants' failure to act in response to the bullying.  As discussed above, however, most of the alleged bullying purportedly occurred in locations beyond the control of Defendants Dodgion, Williams, or Arthur, was not seen by them, and was never reported to any of them.  Plaintiff has not provided evidence that any of the individual Lawrence

County Defendants had notice of any bullying occurring in a PLTW class.  This Court previously declined to dismiss the negligence claim on the theory that all Defendants were "on notice that Plaintiff Galloway was repeatedly bullied and harassed, including being sexually assaulted in both the Chesapeake schools and in the Collins Career Center."  (Doc. 34 at 25).  As discussed above, however, the evidence now shows that no alleged sexual assault took place under the auspices of Defendant JVS, and Defendants Dodgion, Williams, and Arthur were never notified of any alleged sexual assault (or any of the other incidents of alleged bullying that occurred in locations outside their control).

Even if simple negligence were the applicable standard, the individual Lawrence County Defendants could not be held liable for failure to take action regarding events about which they had no knowledge and over which they had no control.  Furthermore, as previously noted, the standard for establishing liability on a negligence claim against a public employee is significantly higher than simple negligence.  Under state law, employees of public school districts are immune from liability unless the plaintiff can show that their acts or omissions were "with malicious purpose, in bad faith, or in a wanton and reckless manner…"  O.R.C. § 2744.03(A)(6)(b); *Waters*, 2014 U.S. Dist. LEXIS 44415 at *22.  The Supreme Court of Ohio has held that for purposes of defeating statutory immunity, recklessness "necessarily requires something more than negligence" and defined it as a "perverse disregard of a known risk."  *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at ¶ 73.

As previously noted, the question of whether behavior constitutes reckless or wanton conduct so as to fall within the exception to statutory immunity is ordinarily a

factual question for a jury to decide.  *Alexander*, 2012 WL 831769 at *12 (*citing Fabrey*, 639 N.E.2d at 35).  Therefore, in order to grant a dispositive motion on this question, the record "must be devoid of evidence tending to show that the political subdivision employee acted wantonly or recklessly."  *Id*. (*citing Irving v. Austin*, 138 Ohio App.3d 552, 556, 741 N.E.2d 931, 934 (6th Dist. 2000)).  That is precisely the case here.  Plaintiff's evidence is insufficient to demonstrate the malicious purpose or reckless disregard necessary to overcome the bar of statutory immunity on the part of any of the three individual Lawrence County Defendants.

The Court finds that summary judgment is therefore appropriate as to Plaintiff's negligence claims against Defendants Dodgion, Williams, and Arthur.

## V.    CONCLUSION

Accordingly, based on the foregoing, the Chesapeake Defendants' Motion for Summary Judgment (Doc. 57) is hereby **DENIED**; and the Lawrence County Defendants' Motion for Summary Judgment (Doc. 67) is hereby **GRANTED**.  Specifically, Plaintiff's claims against Defendants Lawrence County Joint Vocational School District Board of Education, Steve Dodgion, Kim Williams, and Susan Arthur are **DISMISSED**.

**IT IS SO ORDERED.**

Date:  7/21/14                                     *s/ Timothy S. Black*
                                                  Timothy S. Black
                                                  United States District Judge